Quoc T. Pham, SBN 318057
7950 Foothills Boulevard, #16
Roseville, CA 95747
Ph. 916-218-2972
Email: qtplaw@gmail.com
Attorney for John Freeman

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.R., a deceased minor by and through her successor in interest JOHN FREEMAN; JOHN FREEMAN, an individual; and CRISTINA RAMIREZ, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>CONTRA COSTA COUNTY, a public entity; TASHA MIZEL, an individual; MARCIE FRANICH, an individual; AND DOES 1 to 50, inclusive,<br><br>Defendants | Case No.:  19-cv-07152-LB<br>Judge:     Laurel Bieber<br><br>**FIRST AMENDED COMPLAINT**<br><br>Wrongful Death (CCP §377.60) and<br>Survivor Action<br><br>Negligence/Negligence Per Se<br>- Usurpation of Infant's Remains<br><br>42 U.S.C §1983<br>- Count 1: Judicial Deception and Concealment of Evidence<br>- Count 2: Seizure without Warrant<br>- Count 3: Failure to Protect<br><br>Monell-Related Claims<br>- Count 1: Judicial Deception and Concealment of Evidence<br>- Count 2: Seizure without Warrant<br>- Count 3: Failure to Protect<br><br>Date Action Filed: October 29, 2019<br><br>**Jury Trial Demanded** |

**PROLOGUE**

1.      John Freeman, on behalf of his deceased daughter D.R., commenced this suit against Contra Costa County, Tasha Mizel, and unknown Doe defendants for their actions or inactions that led to the seizure of their daughter without and warrant and the death of D.R. while she was under the care, custody, and control of Contra Costa County.

2.      D.R. was born on Friday, June 22, 2018.

3.      On and about Sunday, June 24, 2018, the maternal grandmother of D.R. told Freeman that he could be the father because the infant looked like him. Freeman told the MGM that he would take responsibility for the child and that he would assert his paternity the next day.

4.      On Monday, June 25, 2018, two social workers from Contra Costa Department of Children and Family Services showed up at the hospital without a warrant and seized D.R. from the custody of the maternal grandmother [MGM].

5.      The social workers refused to leave the child either with the MGM or Freeman.

6.      Upon learning of the seizure, Freeman immediately contacted DCFS to assert his parental rights on the same day.

7.      Freeman made purchases for all the needs of a baby and prepared his home to take in D.R.

8.      A DNA test later showed with almost certainty that Freeman was the biological father of D.R.

9.      DCFS refused to turn over the child to Freeman or any other relatives and petitioned the state dependency court of Contra County on and about June 28, 2018.

2

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

10.     DCFS placed D.R. in foster homes, with the final three months in the home of Marcie Franich.

11.     On October 27, 2018, D.R. died in the home of Franich. She was four months old.

12.     At the time of death, except for a minor illness, D.R. was otherwise in good health. She had no illicit drug in her system and had no withdrawal issues.

13.     Plaintiff D.R., through her father, brings this action against the defendants for their actions or inactions, leading to the deprivation of life of D.R. and familial associations between D.R. and her parents.

14.     Plaintiff Freeman brings this action against Contra Costa defendants for wrongful death, negligent infliction of emotional distress, judicial deceptions, and deprivation of familial associations.

**JURISDICTION AND VENUES**

15.     Each of the defendants herein, except for Franich, was at all relevant times acting under color of law.

16.     42 U.S.C. § 1983, and 28 U.S.C. § 1331 confer jurisdiction for the third and fourth causes of action in this court.

17.     The Court also has supplementary jurisdiction over related causes of action under common and state statutory laws for the other causes of action.

18.     Because the acts and omissions complained herein occurred in Contra Costa County, and it is believed that all living parties currently reside in this county, venue is proper in the Superior Court of California in Contra Costa County or the Federal District Court of Northern California.

19.     Plaintiff Freeman had submitted a notice of claims to Contra Costa County. The notice was received on April 16, 2019, within six months of the death of D.R.

20.     Freeman submitted the Notice of Claims without full knowledge of the circumstances and causes of the death of D.R. because Contra Costa County delayed the release of coroner's report of the death to the state dependency court and to Freeman.

21.     On or about April 29, 2019, the Clerk of the Board of Supervisors of Contra Costa County wrongfully rejected the claim as partially untimely and wrongfully rejected the timely portion of the claims.

22.     Contra Costa Coroner's Office released a report on the death of D. R. on and about April 2, 2019, almost six months after the date of death. DCFS did not provide Freeman or his appointed attorney a copy of the autopsy reports.

23.     Freeman did not receive a copy of the autopsy report from his appointed attorney until late July 2019.  Freeman discovered additional facts and circumstances about the death of D.R. from this report, namely the cause of death and the identity of the foster mother who caused the death.

24.     On September 11, 2019, Freeman submitted an amended notice of claims to Contra Costa County. This notice was received on September 17, 2019.

25.     This amended notice of claims should be timely under the late discovery rule.

26.     On September 9, 2019, the Clerk of the Board of Supervisors of Contra Costa County rejected this amended notice as untimely.

27.     Upon information and belief, to avoid liability, Contra Costa County has a policy of falsely claiming timely notice of claims as untimely.

28.     Upon information and belief, to avoid liability, Contra Costa County has a policy of wholesale rejecting all notice of claims even though they are valid.

29.     These allegations are based on plaintiff Freeman's personal knowledge, investigations by plaintiff's counsel, and on information and belief.

**PARTIES**

30.     At all times relevant, D.R. was a resident of Contra Costa County.

31.     At all times relevant, plaintiff Freeman is a resident of Contra Costa County in the State of California.

32.     At all times relevant, Freeman was a biological father, and a successor in interest to D.R. Freeman represents D.R.'s interest in this lawsuit as her successor in interest. His parental rights to his daughter D.R. has never been terminated.

33.     At all times relevant, plaintiff Ramirez is a resident of Contra Costa County in the State of California.

34.     At all times relevant in this complaint, Cristina Ramirez was a biological mother of D.R. Her parental rights to her daughter D.R. has never been terminated.

35.     No proceeding is now pending in California for the administration of the decedent's estate.

36.     No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding.

37.     At all times applicable herein, defendant Contra Costa County (County), was and is a public entity.

38.     Contra Costa County Department of Children and Family Services (hereafter referred to as **DCFS**) is a subdivision, entity, or administrative unit of defendant Contra Costa County.

39.     Tasha Mizel was employed, at relevant times herein, by DCFS as the case social worker for D.R. She is a resident of California at the time service of process.

40.     Upon information and belief, unknown investigative social workers, referred to as Doe Defendants, seized D.R. and petitioned the state court to make D.R. a dependent child.

41.     Upon information and belief, every dependency case from Contra Costa is passed from one to another set of social workers and their supervisors.

42.     Upon information and belief, every decision for action is a group decision taken by the case or investigative social worker, her supervisor, the director of DCFS, and sometimes the Board of Supervisors of Contra Costa County.

43.     These social worker defendants, supervisor defendants, and the director of DCFS shall be referred to as the **DCFS defendants**.

44.     Marcia Franich was the foster mother of D.R. for the last three months of her life.  As such, Franich is an agent acting on behalf of Contra Costa County in the care, custody, and control of D.R.

45.     Because the California Welfare and Institutions Code prohibits unauthorized access to juvenile dependency records, at the time of the filing of this amended complaint, Plaintiffs do not know the names of all defendants. Their identities are not known at this time but could be ascertained from the records or upon discovery. Plaintiffs are in the process of seeking permission from the state court to gain limited access to the records for this litigation. Even though state and federal laws authorized the release of court records in case the child died in the

6

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

custody of DCFS, the state court still has not issue an order granting Freeman's application to release D.R.'s dependency court records.

46.     Plaintiffs reserve the right to amend and join additional plaintiffs.


**GENERAL ALLEGATIONS**

47.     At all times mentioned herein, each of the above defendants except for Franich (who acted as their agent) was an officer, agent, or employee of the County of Contra Costa. Each acted under color of law within the course and scope of their respective duties in doing the things and acts herein alleged.


**Obstruction of Placement of D.R. with Freeman or Her Relatives**

48.     DCFS learned that D.R.'s mother tested positive for drug.

49.     However, D.R. was healthy and had no drug withdrawal symptoms.

50.     Ramirez wanted her mother, the maternal grandmother (MGM) of D.R., to take custody of the child.

51.     The MGM had already taken good care of another child of Ramirez for years.

52.     However, on June 22, 2018, the Monday of the week after, DCFS social works refused to let the MGM take her grand-daughter home on the excuse that her husband, the maternal step-grandfather had a DV record some 35 years ago when he was in his late teen.

53.     There have been no other criminal records since then. The husband is not a child abuser and would not be of any threat to the health and safety of the child had she been placed in the MGM's home.

54.     The MGM told plaintiff Freeman on June 21, 2018, that he was most likely the father because the baby looked like him. Before this date, Freeman did not know that Cristina carried his child.

55.     On the same Monday, Freeman asserted his parental right and informed DCFS that he was willing, able, and ready to take up the custody and care of his daughter D.R.

56.     After the detention hearing on and about June 28, 2019, Freeman gave the social workers baby clothes and supplies to pass on to the foster parents.

57.     At the same hearing, Freeman and other relatives, including one who is a pediatric nurse, indicated that they are willing, able, and ready to take in D.R.

58.     The MGM was in constant contact with DCFS social workers at least twice a week to check on D.R.'s health and to tell them that she is ready, willing, and able for placement.

59.     The MGM did everything she had to do to qualify for the placement of her granddaughter in her home, including taking the required classes.

60.     DCFS still refused to place D.R. with her grandmother.

61.     Kristy Hunt, a pediatric nurse cousin of the father, was also available for placement.

62.     Freeman informed social worker Tasha Mizel on many occasions that D.R.'s paternal grandmother Kay Crigger-Freeman and paternal aunt Chasity Freeman are also ready, willing, and able to have D.R. placed with them.

63.     Defendant Mizel told Freeman that she would reach out to the maternal grandmother to provide information on how to apply for the placement of D.R. in her home.

64.     Crigger-Freeman never received any call or message from Mizel for the placement.

65.     Under state and federal laws, CFS is required to provide information to relatives on how to apply for placement.

66.     CFS is required under law to provide reasonable services to avoid separation of the child from her family and relatives.

67.     The laws require CFS to put a higher priority on placement with family and relatives.

68.     DCFS received 95% of its budget from federal and state money.

69.     For each child DCFS adopted out, they would receive from $4,000 to $6,000 in federal money.

70.     DCFS also receives federal money to cover for the administrative expenses and wages.

71.     Contra Costa DCFS has a long history of obstruction of relative placement so that they could adopt children to strangers for federal incentive money under Title IV-E.


**Freeman's False Positive Drug Test**

72.     Upon information and belief, Contra Costa Sheriff Department provides the court with bailiffs and officers under a contract with the California Office of Administration of Courts.

73.     The bailiffs are assigned the task of the administration of drug tests and the determination of the test results.

74.     However, the court bailiffs do not have adequate training, education, and experience on how to perform the testing and interpretation of the test results.

75.     DCFS and the court bailiff have a duty to perform accurate drug tests and to interpret the test results and take into account possible false-positive results caused by any other medications taken by the test subjects.

76.     During the dependency process, the DCFS forced Freeman to take a drug test without the advice and presence of his counsel.

77.     Freeman was not asked before the test whether he had taken any medications.

78.     A court bailiff administered the test, which came back positive for amphetamine.

D.R. et al v. Contra Costa County, Mizel and Franich et al.        FIRST AMENDED COMPLAINT

79.     Neither the bailiff nor DCFS ascertained whether the test result could be a false-positive before announcing the result to the dependency court.[1]

80.     Freeman told Mizel that the test was a false positive because he had taken at the time of the drug test, Zantac, an over-the-counter medication for heartburn.

81.     DCFS was informed of Zantac but failed to provide exculpatory evidence to the court.

82.     As a result, the court did not let D.R. to be placed with Freeman and any of D.R.'s relatives.

**Suspicious Death in the Foster Home**

83.     The case social worker for a foster child is required to make regular monthly visits and inspection of the foster home and monitor the health and safety of the foster child.

84.     Marcie Franich and her husband were selected by DCFS to act as foster-parents for D.R.

85.     Upon information and belief, DCFS placed D.R. in their home for at least three months.

86.     Upon information and belief, the Franich family had another young child.

87.     Before the placement, DCFS failed to ensure the foster-parents had time and resources to take care of an additional baby with full attention by the caregiver without any distractions, and that the foster-parents could provide a safe environment for an infant.

88.     Before the placement, failed to ensure that Marcie Franich has sufficient knowledge and skills to take care of an infant, such as knowledge of safe sleeping practice and how to administer CPR to an infant.

89.     Defendant Mizel, as the case social worker, failed to notice that the foster-parents had to take care of an additional baby of their own.

---

[1] Freeman has never had another positive drug test since then.

90.     Defendant Mizel, as the case social worker, failed to supervise and monitor Marcie Franich to notice that Franich had a dangerous practice of swaddling D.R. tightly.  In particular, a few days before the death of D.R., Mizel passed along a photograph of the tightly bundled D.R. to Freeman without noticing the danger. Freeman received this photograph after her death.

91.     DCFS did not ensure that Franich had a safe sleeping environment for an infant in compliance with California Health and Safety Code § 1596.847, which prohibits the use of an unsafe crib by a licensed care provider for children.

92.     Defendant Mizel, as the case social worker, failed to notice that Franich had a DockATot (see photographs of the DockATot at http://www.dockatot.com).

93.     DockATot, according to the website, "**DockATot**® is a multi-functional lounging, playing, chilling, resting and snuggling dock for baby and tots 0-36 months. Created with love in Sweden." It has thick cushion borders like a rubber dingy.

94.     DockATot is not recommended for an infant to sleep in unsupervised.

95.     DockATot was not appropriate for a tightly swaddled infant who could turn over.

96.     Health Canada issued a warning that it's not safe to leave a baby in a baby nest like DockATot unattended, including when the parent is asleep.

97.     In response, A DockATot spokesperson told Today's Parent that DockATot did not recommend their product for baby sleeping, in Canada. "The DockATot is used by many for supervised lounging, chilling, and playtime," she said. "We subscribe to Health Canada's guidelines for the promotion of our products to Canadians. We do not promote our products to Canadians as intended for sleep accommodation."

98.     On October 27, 2018, Franich tightly swaddled D.R. and placed her unsupervised in a DockATot in a crib/bassinet.

99.     A few hours later, Franich found D.R. faced down and unresponsive.

100.    Franich applied CPR to D.R. as an adult victim with two hands instead of gentle compression using only two fingers.

101.    D.R. was taken by ambulance to a hospital where she was pronounced dead.

102.    Even though Tasha Mizel had D.R.'s remains cremated about ten days after the death, CFS had to continue the court hearing several times because they could not get the findings from Contra Costa Coroner's Office until April 2019.

103.    According to the California Department of Public Health, coroners are required by law to report the information on a SIDS death within 24 hours after the gross autopsy. The coroner should have filed a report within a day to the health department of residence[2].

104.    At this time, we do not know if the foster-mother placed the child to sleep facing down or facing up in the DockATot.

105.    If D.R. somehow managed to turn herself over while tightly swaddled, suffocation would have been an inevitable result as a result of the construction of the DockATot – soft material with all-around high borders.

106.    The autopsy revealed that D.R. had internal bleeding in her abdominal cavity and bruises to her internal organs.

107.    D.R. also suffered unexplained bruising on the back of her skull, but the coroner did not investigate this injury further for cause.

108.    The coroner listed the cause of death as "probable cardiac rhythm disorder (dysrhythmia) which means either the death was caused by the heart stop beating (duh) or by an abnormal heart rhythm.

109.    The latter could not have been a cause because there was no EKG. The child was already dead when emergency personnel arrived at the scene.

---

[2] See https://www.cdph.ca.gov/Programs/CFH/DMCAH/SIDS/Pages/Protocols.aspx

D.R. et al v. Contra Costa County, Mizel and Franich et al.            FIRST AMENDED COMPLAINT

110.     The coroner did not take into account the use of the DockATot while the child was tightly

swaddled.


**Mishandling of the Remains**

111.     The death is highly suspicious, given the unexplained bruises on the back of the head,

internal injuries and bleeding, and the hasty cremation of the body by CFS before an autopsy

report was available.

112.     There was no reason to withhold the report for almost six months. No proper

investigation was carried out to ascertain the cause of the bruises at the back of the head of the

child and her internal injuries.

113.     The County delayed over and over the release of the autopsy report for months.

114.     The County did not provide the autopsy report to either parent.

115.     Defendant Mizel called Freeman a few days after the death, while he was in distress and

mourning, fraudulently induced consent to cremate the body of the child. Mizel stated that if

Freeman could not make up his mind right away, she would have D.R. cremated anyway.

Freeman was still grieving the death of his child. He was not in a state of mind to be able to give

consent to the request for the cremation.

116.     Mizel did not receive consent from the D.R.'s mother to have the body cremated.

117.     The child's body was cremated upon direction by social worker Tasha Mizel who falsely

claimed to be D.R.'s next of kin.

118.     The coroner's office should have known that Mizel was not the next of kin. She was only

a case social worker.

119.     Mizel, DCFS, and the coroner's office had never obtained any authorization from

Freeman's counsel or the court for the disposal of the body by cremation.

120.     D.R.'s relatives never had a chance to view the body of the child before the cremation.

121.    The County is trying to suppress and destroy evidence so to avoid civil and criminal

liabilities.

122.    Upon information and belief, Mizel and other DOES defendants from DCFS wanted to

destroy evidence to prevent an independent autopsy finding of the real cause of death.

123.    Contra Costa DCFS has a long history of covering up abuse, neglect, and deaths of

children under their custody.

124.    For examples, the First District Court of Appeal, in a recent opinion, In re B.D. (case

numbers A155254 and A155571) chastized DCFS for placing and adopting a young boy to an

abusive foster who abused his own children, who themselves abused other children, and

concealing this fact from the dependency court judge.

125.    A few months ago, a father and son were charged with abusing foster children for years.

In 2013, an investigator from DCFS knew that Simon Chavez Jr. had kissed a teen foster child

but took no action[3].

126.    In 2014, when the news broke out that Michael Mallett committed suicide by cops when

the sheriff officers came to arrest him, DCFS sequestered young female foster child victim by

placing her in a closed mental institution in Texas and cut her off from all contact with her

relatives. DCFS also denied all responsibility for the placement of another mentally disabled

child in the same foster home. In 2017, DCFS had to return a child near death to her uncle in

Sacramento with little notice. DCFS then cut off her mother from contact with the child and

moved the court for a detrimental finding against the mother for complaining to the court that her

daughter was abused and neglected while under the custody of DCFS. See "A Betrayal of Trust"

Child Molestation Alleged in Contra Costa CPS", by Patrick Howley, August 27, 2019 (updated

---

[3] https://www.mercurynews.com/2020/02/07/antioch-foster-dad-admitted-to-kissing-teen-in-2013-counties-kept-sending-foster-kids-there-until-he-was-charged-with-child-molestation/

January 8, 2020,  https://www.theepochtimes.com/a-failure-of-trust-child-molestation-in-the-contra-costa-cps_3058888.html).

127.    On one hand, Contra Costa DCFS does not have an established process and procedure to handle complaints about inadequate placement, abuse and and neglect of foster children.  On the other hand, DCFS will engage in perjury and fabrication to retaliate against any parent who complained of abuse and neglect of children in the custody of DCFS. See Salah v. Contra Costa County et. al. (Northern District of California, case number 18-cv-00470.

128.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.


**Delaying of the Disclosures/Concealment of the Cause of Death**

129.    Defendant Mizel told the parents that their daughter died, but she never provided them with any detail of the death.

130.    Mizel never told Ramirez that she had gone ahead with the cremation.

131.    No relative was allowed to view the body.

132.    No funeral was held for D.R.

133.    DCFS never provided the parents with the coroner's report.

# CAUSE OF ACTIONS

**FIRST CAUSE OF ACTION**

**Wrongful Death and Survivor Action**

**Plaintiffs Against Defendants Mizel, Franich**

**and Does 1 Through 50**

134.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

135.    Plaintiff D.R. deceased at four months old, left no issue or surviving spouse.

136.    Plaintiff John Freeman is D.R.'s natural father whose parental rights were never terminated and thus has standing under CCP §377.60(a) to bring a wrongful death action. Freeman is a rightful heir under CCP §377.60(a) and Probate Code §6402(b) and §6450(a).

137.    D.R. was a dependent of Contra Costa County Juvenile Court at the time of her death. D.R. was under the custody, supervision, care, and control of DCFS for the purpose of care, supervision, and control of the minor's health, welfare and safety. The rights, duties, and responsibilities of D.R.'s parents were suspended and assumed by Contra Costa DCFS and its social workers and the foster parent Marcia Franich. Thus, the County and each of the individual Defendants assumed mandatory statutory duties arising under state law, to provide for the continued safety and security of the child and to provide at least minimally adequate care, including a safe sleeping environment.

138.    Plaintiff D.R. further detrimentally relied upon the DCFS and Franich for her care, health, welfare, safety, and well-being.

139.    As such, plaintiff D.R. detrimentally relied upon defendant Mizel and other social workers to fulfill their duties, including (1) to supervise the foster care and services by Marcie Franich, and (2) to supervise and monitor other children DCFS placed in foster care.

140.    Because of the D.R.'s detrimental reliance on the defendants' activities, duties, and responsibilities, while under the custody of care of DCFS, a special relationship was established between D.R. and the defendants. The County and the individual defendants had an affirmative duty to supervise Franich, to monitor D.R., and to prevent negligent acts.

141.    The County defendants, with the exercise of reasonable care, should have known or reasonably known that an infant such as D.R. could be suffocated in her sleep if placed in an unsafe sleeping environment without monitoring.

142.    Defendant Franich, as D.R.'s foster mother, owed D.R. a duty of due care under a special relationship.

143.    Defendant Franich, with the exercise of reasonable care, should have known or reasonably known, the DockATot, because of its construction, is dangerous for a swaddled and unsupervised sleeping infant who can turn over.

144.    D.R. was found face down, unresponsive, and deceased in the DockATot after Franich left her to sleep in a DockATot unsupervised for hours.

145.    D.R. died of suffocation and she suffered bruises to the back of her head and internal bleeding and injuries, from the improper application of CPR and possibly from other unknown causes that could have been uncovered had the County did not gotten rid of evidence by cremating her remains.

146. Defendants Contra Costa DCFS, Mizel, and Franich breached their duty of reasonable care of D.R. as well as several mandatory statutory duties including but not limited to:

a. Cal. Welf. & Inst. Code, §361.4 and CDSS MPP[4] Regulations 31-405, 31-420, and 31-445, by failing to fulfill a social worker's responsibilities for placement of the child in the most appropriate home environment.

b. Cal. Welf. & Inst. Code, §361.3 and California Department of Social Services MPP Regulations 31-405.12, by failing to give preferential consideration for placement of the child to an adult who is a grandparent, aunt, uncle, or sibling of the child.

147. Plaintiff further alleges that DCFS, Mizel, and DOES 1-50 failed and neglected to establish, implement and follow policies and procedures to ensure the health, safety, and well-being of plaintiff D.R. and other minors, including, but not limited to, the supervision, monitoring of the safety of the foster homes and the health and welfare of foster children.

148. If they had done their jobs, D.R. would not have died in her sleep, unsupervised and wrapped up like a mummy, in the dangerous DockATot.

149. Under California Government Code §820, an employee of a public entity is liable for his or her acts or omissions to the same extent as a private person.

150. Under California Government Code §815.2, the public entity is vicariously liable for the torts of its social workers committed in the scope of employment. DCFS is therefore vicariously liable for the misconducts of its employees and agent, causing the death of D.R.

151. Contra Costa County is vicariously liable for the negligence by Franich committed during the scope of her contract as a foster parent for DCFS causing the death and suffering of D.R.

152. Franich herself is liable for the negligence causing the death and suffering of D.R.

---

[4] California Department of Social Services Manual of Policies and Procedures.

153.    As a direct and proximate result of defendants' conduct, plaintiffs suffered damages stemming from the physical injuries, mental anxiety and distress, loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support from the death.

**SECOND CAUSE OF ACTION**

**Negligence and Negligence Per Se – Usurpation of Infant's Remains,**

**Negligent Infliction of Emotional Distress**

**Plaintiffs D.R., Freeman and Ramirez Against Mizel and other DOES Defendants**

154.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

155.    Defendants unlawfully seized and usurped from the parents the care, custody, and control of D.R.'s remains.

156.    The County prevented the grieving parents and other relatives from making fundamental decisions on the arrangement for their daughter's funeral and disposition of her remains.

157.    The County did not allow the parents and other relatives an opportunity to view the body and arrange for a proper funeral for D.R.

158.    The defendants breached their duty and harmed to the parents by improperly disposing of the remains, causing them emotional distress.

159.    Defendants also were *per se* negligent in violating California Health and Safety Code §7100 expressly gives "[t]he right to control the disposition of the remains of a deceased person, the location and conditions of internment, and arrangements for funeral goods and services to be provided" to the parents of a deceased child.

19

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

160.    As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered general and special damages according to proof at trial, including but not limited to physical and mental anxiety and anguish and severe emotional distress.

161.    Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, acted with malice and with the specific intent to cause injury to the parents, or acted with a willful, knowing, and conscious disregard for their rights in a despicable, vile and contemptible manner. Therefore, the parents are entitled to an award of punitive damages to punish and deter these Defendants, and others, from such conduct in the future.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983**

**COUNT 1**

**Violation of Right Under the Due Process Clause under the 14th Amendment**

**Judicial Deception and Concealment of Evidence**

**Plaintiffs Freeman Against Tasha Mizel and DOES 1-50**

162.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

163.    Under the 14th Amendment and legal precedents, the people have a clearly established right not to be subject to violation of due process through judicial deception and concealment of evidence.

164.     Defendant Mizel and other DCFS DOES defendants should have know that they cannot violate these clearly establish rights.

165.     DCFS social workers saw plaintiff D.R. as a blue-eyed and blonde haired girl easily placed for adoption so that DCFS and the County could collect adoption incentive money from the federal and the state governments to fund their operations and to support the high salaries of the county supervisors and the DCHS managers and directors.

166.     When a child is younger than three years old, California law allows the parents ONLY six months to complete the reunification plans successfully to get the child back.  In reality, with the incentive money for adoptions, reunification rarely occurred.


**Obstruction of Paternity Claim and Parental-Child Association and Relationship**

167.     Defendants Tasha Mizel and others from DCFS failed to provide evidence to the court that Freeman stepped forward immediately and as soon as practicable to assert his parental rights and responsibilities[5].

168.     Defendants Mizel and other DCFS defendants, while claiming in submission to the state court that reasonable services had been provided to prevent removal of D.R. from their parents' custody, could have easily directed the parents to file a Voluntary Declaration of Paternity[6] so Freeman could have obtained his presumed status as the father.

169.     Mizel and other DCFS DOES defendants concealed from the court that Freeman had promptly stepped forward to assume his parental responsibility.

---

[5] Judge Hardie of the dependency court stated that Freeman did not step up soon enough so she would not grant him status as the presumed father.
[6] The parents would have to sign a standard form with the signatures notarized. John would have automatically obtained full status as the father under California law without having to go through multiples obstacles put up by the County.

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

170.    Freeman was denied his constitutional rights to the care and familial relationship of his daughter during the four months of her life and this relationship were cut short because of avoidable her death.

**The False Positive Drug Test**

171.    Mizel and other DCFS DOES defendants recklessly used the drug test against Freeman even after he informed them that the test was a false positive because he took Zantac for heartburns.

172.    A quick search on Google would confirm that Zantac is a cause for a false positive test for amphetamine.

173.    As a result of the judicial deceptions, the state dependency court denied Freeman his "presumed" father status.

174.    He only has the lower status as a biological father, and as such he does not even have the right to view the court documents, medical and police records related to the case.

**Cover Up of a Suspicious Death**

175.    Mizel and other DCFS DOES defendants schemed and conspired to:

a) Using undue influence, coercion, and deception to cremate the body of D.R. so that an independent autopsy could not be carried out. The parents' counsels, the minor's counsel, and the court did not know for months of the cremation until Freeman made his attorney bring up the issue in a hearing.

b) Delaying the release of the autopsy results for almost six months to hide evidence of their neglect and to avoid liabilities for common law torts by running out the clock on the six

months plaintiffs had to file a Notice of Claims against the County under the California Government Torts Claims Act.

c) Deliberate indifference to suspicious injuries to the child. It seems that DCFS has a double standard – they would take a child on any or made-up account of child abuse as little as a bruise while, in this D.R.'s case, a death of a child under their custody from reckless disregard for danger and suspicious injuries were swept under the rug.

**COUNT 2**

**Violation of Rights under the Fourth and the Fourteenth Amendments -**
**Seizure without a Warrant and Interference with Familial Relationship**
**Plaintiffs Against DOES 1-50**

176.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

177.    Under the Fourth Amendment, D.R. could not be seized and taken from her parents without a warrant when there were no exigent circumstances, no imminent danger of serious bodily harms, when she would not have suffered any worse harms during the time it would have taken to obtain a warrant, OR when there were other lesser intrusive methods.

178.    Parents and children have a clearly established right under the 14th Amendment to their familial relationship.

179.    DCFS social workers, whose identities are not currently known, who took D.R. from the hospital against the will of the parents, acted under color of state law, should have known that it is unlawful for the children's rights to familial relationship and family integrity to be severed

without a warrant when there were no exigent circumstances, no imminent danger of serious bodily harms, when she would not have suffered any worse harms during the time it would have taken to obtain a warrant, OR when there were other lesser intrusive methods.

180.     D.R. was in good health and was about to be discharged from the hospital into the custody of the MGM as requested by D.R.'s mother when the DCFS social workers swooped in to seize the children without a warrant.

181.     Under the circumstances, Freeman asserted his parental rights and provided notice to DCFS as soon as practicable.

182.     As stated above, under the law, the DCFS social worker failed to take a lesser intrusive alternative by letting Freeman OR other qualified, ready, available, and willing relatives take in D.R.

183.     As a direct and proximate result of the DCFS defendants, D.R.'s rights under the 4th Amendment, the plaintiffs' rights under the 14th Amendments were violated, D.R. was denied her rights to live with her family and relatives in a safe and nurturing environment and had to die in the home of a stranger, and the parent plaintiffs were denied their familial relationship with D.R.

184.     The County violated the parents' rights under 14th Amendment to be informed of the cause of the death of their child, to have a say in the disposal of the body and to conduct a funeral for their child.

185.     Plaintiffs have suffered and will continue to suffer, general and special damages according to proof at trial, including but not limited to physical and mental anxiety and anguish, among other things.

186.    Due to the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

**COUNT 3**

**Failure to Protect**

**Plaintiff D.R. Through Her Successor in Interest Freeman**

**Against Defendants Mizer and DCFS DOES 1-50**

187.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

188.    Plaintiff D.R. brings this cause of action against Defendants as the cause of action survives her death under CCP §377.20 brought on her behalf by her successor in interest John Freeman, her father and rightful heir, under CCP §377.30, CCP §377.60(a) and Probate Code §6402(b) and §6450(a).

189.    By taking D.R. into their custody, DCFS had created a special relationship between them and D.R., an infant who could not take care of herself.

190.    By putting D.R. in an unsafe environment, DCFS had assumed responsibility to her under the danger creation exception. They exposed D.R. to unnecessary danger. Her death could have been avoided had she been put under the care of her ready, willing, and able relatives who qualified for placement under state law.

25

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

191.    It is obvious to any reasonable person, especially a social worker tasked with the care and custody of children such as Mizel, that a very young infant would be vulnerable to the risk of suffocation if placed to sleep in a dangerous environment.

192.    Mizel and other DCFS DOES defendants failed to inspect the foster home and the sleeping arrangement for D.R. as required by state law at three regular monthly visits to the foster family home.

193.    Alternatively, Mizel and other DCFS DOES defendants knew of, but reckless disregard the danger of the DockATot, of the tight swaddling, of her unsupervised sleep in the DockATot while being swaddled tightly, the distraction of another young child in the family, the lack of CPR training by the foster mother, etc.

194.    As a result, D.R. suffered internal injuries from the improperly applied CPR, and D.R. died of suffocation when she turned over in her sleep.

195.    Mizel and other DOES defendants owed D.R. a duty to thorough and complete investigation into the actual causes of death, but the ignored suspicious injuries to the back of her head, the internal bleeding, and the bruising of internal organs.

1
2
3
4

**FOURTH CAUSE OF ACTION**

**Monell Claims against Contra Costa County by Plaintiffs**

5    196.    The County and DCFS had a duty to implement and follow policies, customs, and/or

6    practices which confirm and provide the protections guaranteed under the United States

7    Constitution and federal law. The County had a duty to use reasonable care to train, supervise,

8    and control its social workers, so as not to trespass on constitutional and statutory rights of

9    children such as D.R. and those of parents such as Freeman and Ramirez.

10

11

**COUNT 1**

12

**Policies, Practices, and Customs Causing Judicial Deception and Concealment of Evidence**

13

14

15    197.    Plaintiffs reallege and incorporate all paragraphs and allegations in this amended

16    complaint in each of the causes of action below as if set forth in full.

17    198.    At the time of the underlying events, the County's customs and practices included, but

18    were not limited to:

19        a) Not providing parents with information regarding their child's current living and health

20    conditions.

21        b) Not requiring a social worker to perform regular updates to the parents of their child's

22    living conditions in foster care.

23        c) Not requiring diligent monitor, visit, interview, and check up on a child in foster

24    placement by social workers.

25

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

d) Allowing social workers to forgo regular complete, thorough, and accurate reporting and continuing to evaluate the appropriateness of placement.

e) Concealing from the parents and the dependency court abuse, neglect, and molestations of foster children.

In the case In re B.D., a recent decision from the California First District Court of Appeal where Contra DCFS social workers concealed from the dependency court that they put a foster child into the foster home where the father had a criminal record, abused his three sons who in turn abused other children. The foster/adopting father had his own parental rights terminated. The case social worker always reported the child as "thriving" until the state judge got a rude awakening when one month after ordering the child to be adopted, the foster father was dragged into court to have the parental rights terminated. This policy is widely known, tolerated and carried out by DCFS and their counsels who regularly disregard their duty of candor to the court.

f) Retaliating against parents who complained and reported abuses, neglect, and molestations of their children in the foster care system by engaging in a campaign of sabotaging their reunification services and manufacturing negative facts in the status reports to terminate their parental rights, sometimes with the full knowledge and complicity of county counsels in dependency proceedings.

g) Not having an outside agency not controlled by DCFS to review, investigate, and enforce fixes to their dysfunctional and corrupt system. Even though Contra Costa has an ombudsperson to receive complaints from parents, DCFS routinely ignores her referrals of complaints.

h) Wholesale denial and covering up of abuses, neglect, and molestations of children in the foster care system.

D.R. et al v. Contra Costa County, Mizel and Franich et al.          FIRST AMENDED COMPLAINT

199.     Contra Costa DCFS has suffered years after years with having an adequate number of social workers to deal with the heavy caseloads.

200.     As a result of these policies, practices, and customs, social workers cut corners by taking shortcuts such as throwing parents under the bus, skipping on inspections and monitoring of foster homes and foster children, obstructing placement with relatives, etc.

201.     The County benefits from all the wrongdoings because with more placements in foster homes and with more adoptions bringing them federal and state incentive money.

202.     As a result of these policies, practices, and customs, Freeman suffered damages as described in the first count of the Third Cause of Action.


## COUNT 2

**Policies, Practices, and Customs Causing Seizures Without Warrant**

**and Interference with Familial Relationship**


203.     Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

204.     At the time of the underlying events, the County's customs and practices included, but were not limited to:

      a.   Having social workers stalking and taking newborns from maternity wards without a warrant when the mothers had previous cases without considering changes of circumstances which have removed any risks to the child.

b.  Having social workers taking newborns from maternity wards without a warrant when there was a positive drug test for mother or baby without any consideration for placement with other family members.

c.  Having social workers taking children without a warrant when there was sufficient time to obtain a warrant and when there are lesser intrusive means to ensure their safety.

d.  Ignoring statutory requirements of prioritizing placement with relatives.

e.  Obstructing placements with and placement applications by relatives.

f.  Having a marked preference of taking young children easily placed for adoption to profit from federal and state funding.

g.  Not having any policy, practice, or training for the social workers so that they know not to violate the Fourth Amendment rights of children by warrantless seizures without imminent danger or without danger within the time to secure a warrant or when there are lesser intrusive means to ensure safety.

205.   As a result of these policies, practices, customs, and lack of training, the plaintiffs suffered damages under the second count of the Third Cause of Action.


**COUNT 3**

**Policies, Practices and Customs Causing Failure to Protect**


206.   Plaintiffs reallege and incorporate all paragraphs and allegations in this amended complaint in each of the causes of action below as if set forth in full.

207.    At the time of the underlying events, the County's customs and practices included, but were not limited to:

a) Not providing parents with information regarding their child's current living and health conditions.

b) Not requiring a social worker to perform regular updates regarding a child's living conditions.

c) Not requiring diligent and competent monitor, visit, interview, and checkup a child in foster placement.

d) Allowing social workers to forgo regular complete, thorough, and accurate reporting and continuing to evaluate the appropriateness of placement.

e) Concealing from the court and the parents abuse, neglect, and molestations of foster children. See In re B.D., a recent decision from the California First District Court of Appeal.

f) Retaliating against parents who complained and reported abuses, neglect, and molestations of their children in the foster care system by engaging in a campaign of sabotaging their reunification services and manufacturing negative facts in the status reports to terminate their parental rights, sometimes aided and abetted by county counsels in dependency proceedings.

g) Not having any policy to deal with complaints by parents of abuse neglect and molestation of their children through the county ombudsman, as reported by Contra Costa Grand Jury.

h) Wholesale denial and covering up of abuses, neglect, and molestations of children in the foster care system.

i) Not having sufficient staffing of social workers to deal with the heavy caseloads causing them to make mistakes or to cut corners.

208.   Throughout the years, the County suffered over and over scandals in the local news of children being abused, neglected, and molestations.

209.   Contra Costa Grand Jury made a finding that it was unable to confirm that DCFS has a clearly defined set of procedures for investigating and resolving complaints and for evaluating and implementing recommendations for improvements in its policies and procedures.

210.   The Grand Jury also reported that "CFS management interprets the ombudsman's role as not to investigate, but only to bring complaints to the attention of CFS staff. A proposed new ombudsman contract issued to prospective applicants for the position in 2018 describes the CFS ombudsman's main purpose as "to promote and maintain good working relationships between all parties." The contract, which was still being revised at the time this investigation concluded, places limits on the amount of time the ombudsman is allowed to spend on specific tasks and restricts their investigative role to "complaints as referred by the CFS director."

211.   These findings by the Grand Jury provide evidence of the reckless disregard by Contra Costa County for the safety and health of children placed in their foster care system.

212.   As a result of these policies, practices, customs, and lack of training, D.R. suffered injuries and death as described in the third count of the Third Cause of Action.

## PRAYER

WHEREFORE, PLAINTIFFS pray for a judgment against Defendants, and each of them, as to all causes of action as follows:

1.  General and special damages according to proof.

2.  Punitive damages against the individual defendants as allowed by law.

3.  For attorney fees and costs as authorized by law.

4.  Such further relief as the Court deems just and proper.

Date: February 17, 2019

        /s/ Quoc T. Pham

Quoc T. Pham,
Attorney for Plaintiffs.